Mr. Chief Justice, and may it please the Court, the Second Amendment does not prohibit the government from temporarily disarming habitual marijuana users while they persist in using frequently. That tailored restriction easily fits within the historical tradition of disarming categories of people who present a special danger of misuse. That is no license for Congress to deem anyone dangerous. The government must show a historical analog that is relevantly similar in why and how it restricts Second Amendment rights. Here that's habitual drunkard laws. Under historical vagrancy and civil commitment laws, habitual drunkards were imprisoned or confined without specific dangerousness findings based on judgments that habitual drunkards as a class threatened public safety. Surety laws required them to post bond or be jailed. Like 922G3, those restrictions reflect public safety concerns about the dangers of frequently using intoxicants, and 922G3 is less restrictive. Habitual illegal drug users can regain their arms through their own voluntary conduct by not using illegal drugs so often. Upholding 922G3 would not open the door to disarming weekend beer drinkers. Unlike alcohol, illegal drugs are illegal. They're illegal because Congress deems their use dangerous at any level, and their dangers extend beyond their mind-altering effects to the risks of the illegal drug trade. Unlike alcohol, Congress and the Executive Branch have made specific determinations about the dangers of illegal drugs. And unlike alcohol, robust post-ratification history supports disarming habitual illegal drug users, not just frequently intoxicated users. Respondents' contrary approach that no habitual drug users can be disarmed would invalidate 922G3 and parallel state laws, even for habitual heroin, ketamine users, and would replace the Bruin-Rohini framework with a discredited law-trapped-in-amor approach. I welcome the Court's questions. Ms. Harris, the drunkards weren't the only one included in these sorts of statutes. What was the public safety concern about those who, using subtle crafts, juggling unlawful games or plays, feigning themselves to have knowledge of physiognomy, palmistry, or pretending that they could tell fortunes? I'm glad you asked about the vagrancy laws. The vagrancy laws did cover those categories of people. They covered multiple concerns. They covered both people whose disorderly conduct presented a risk of public safety, and that's usually the mentally ill and habitual drunkards, and people who are essentially transients who are considered a threat. I don't think it's a problem that that type of law covered multiple purposes or categories, or the Court would have had to also throw out the surety laws in Rohini, which of course covered a much broader swath of conduct, including whoremongers, nightwalkers, all sorts of other categories of people. I think the fact that there's an overlapping set of categories of vagrancy laws, civil commitment laws, and surety laws that are all singling out people of reference is relevant. So would you argue that it's okay to impose a ban on homeless people who are not drug addicts, but just merely homeless, because vagabonds? For Second Amendment purposes, no, we don't think so. And here's the difference. And why is that? Yes. I think the difference, two things. One is the point with respect to specific application here, and two is a methodological point about Rohini, I think. So here's the reasons. Being homeless is not itself a crime. Being homeless is, at least in many, there's things additional to it for due process purposes. It is not unlike illegal drug usage, something associated with the public safety concerns historically. There is not a robust post-ratification history the same way. These are the kind of constraints you'd look at on top of that. The danger of habitual alcohol users was not merely the fact that they were using an intoxicating substance. The way habitual was defined was that the state of intoxication didn't permit you to have a regular life. All the definitions around habitual alcoholics centered around not merely taking the drug, but the potential effect it had on you because you couldn't control it and would continue to use it. You were acting responsibly towards your family. You were sleeping in the streets. You were doing other things that showed that it incapacitated you. Now it's hard for me to see how, given that drugs affect, there are different kinds of drugs with different kinds of effects, different kinds of duration. We have the illegal ambient user who shouldn't be using the sleeping drug, but is. We have a marijuana user that you say regular is defined by two or three or every other day. But how about the marijuana user who uses it only one day a week and not in their home where the gun is? There was a definition and a situation with habitual alcoholic users that's different than this. Two points. One with respect to the historical definition of habitual drunkards and two with respect to why I think that 922G3 is more tailored and easier to justify than modern day regulations. Habitual drunkards as a category were defined certainly for civil commitment and vacancy purposes. There were no individualized dangerousness findings. It was a sort of judgment made often by magistrates for justice of the peace as to whether someone's conduct was frequent and putting them in the status of a drunkard. So habitual didn't mean frequent or regular. The drunkard piece is what does the work, I think, in a lot of your questions with respect to the level of intoxication. Second, why I think it's not a problem that there is translation of that level of intoxication for habitual drunkards to illegal drug users here. I think 922G3 is a lot more tailored. There's no like founding era breathalyzers to tell you exactly how intoxicating things are. For 922G3, what's happening is you have, first of all, a restriction that is tailored and temporary and less restrictive because it is tailored to how often you're using it within your control. Well, Ms. Hassell, on that, I'm sorry to interrupt, but I just want to, before we lose track of what Justice Sotomayor is talking about, one can ask whether the habitual drunkard statutes are sufficiently, how and why is sufficiently analogous. One can also ask, though, more basically whether this defendant would qualify as a habitual user. And I want to explore that before we lose track of it. Habitual drunkard, the American Temperance Society back in the day said eight shots of whiskey a day only made you an occasional drunkard. We have to remember the founding era, if you want to invoke the founding era. To be a habitual drunkard, you had to do double that, okay? John Adams took a tankard of hard cider with his breakfast every day. James Madison reportedly drank a pint of whiskey every day. Thomas Jefferson said he wasn't much of a user of alcohol, he only had three or four glasses of wine a night, okay? Are they all habitual drunkards who would be properly disarmed for life under your theory? No, and again, I think this is something... Okay, if they're not, then what do we know about Mr. Damani? We know he uses marijuana a few times, about every other day. That's all we have in the record, right? That's all we have in the record. Okay, so we don't even know the quantity of how much he uses every other day. What if he took one gummy bear with a medical prescription in Colorado? Well, you may not even need a medical prescription then. You don't even need that anymore. But let's say he had one to help him sleep every other day. Disarm him for life? Well, we're not... No, it's not disarm for life, and here's what's going on.  Would that be enough under your theory? One gummy bear every other night with a medical prescription? So I think you'd have a potential rahayf problem, but I will accept the hypothetical. So let me just deal with... I think the answer is yes, under the government's theory. Yes, under our theory, but let me give you an explanation of two parts of this that are  One, you asked about how do you tell who's an unlawful user? How is it more defined than a habitual drunkard? I think it's a lot clearer... Is it? I mean, the government has not been able to define what a user is. I mean, it is said at various points that it's someone who's used any illegal drug in the past year, right? It's said, ATF now wants to say a pattern, and you argue for habitual, which of course conflates the second half of the statute, which talks about an addict, which is different than a user, and an addict is an habitual user, it's defined as. So you're kind of conflating the two parts of the statute there. So tell me how it's so clear. Okay, a couple of things to help you with this. One, I'm going to set aside the forfeiture issue, but I would like to return to that later. Just deal with the substance. With respect to who is an unlawful user, the Court of Appeals are uniform in adopting the same view as us, which is that it is a habitual user in context. Well, the ATF disagrees. No, they absolutely do not. It's a pattern. Let me be very clear about the distinction here. There is a distinction between what is the statutory definition of an unlawful user, and everyone has always agreed, including ATF, that that means habitual or frequent. And on the other hand, how do you prove that? What type of evidence is sufficient to show beyond a reasonable doubt or for purposes of background checks for ATF purposes that you, in fact, do that? So that is a discrepancy. Okay, so that circles us back down to you would qualify as an habitual user one gummy bear every other night. Absolutely, and here's why. The check on that sort of situation is twofold. One is you have to know that you are using an unlawful drug. So if you're using your gummy and you don't know that it has THC in it or there's something else, you could have a nice, rehased offense. But setting that aside in terms of other guardrails, illegal drugs are different from habitual drunkards in an important way. First of all, there is robust post-ratification history that I think shows that there is a tight connection between someone who is a habitual drunkard. So if it all boils down to illegality, what do we do with the fact that marijuana is sort of illegal and sort of isn't, and that the federal government itself is conflicted on this? It doesn't enforce it quite the same way it does with respect to drug laws with respect to other drugs. So two points. One, it's not just illegality, but with respect to illegality, I don't think the government is of two minds. The government is considering rescheduling marijuana as Schedule 3 to facilitate medical potential medical applications, but the government is not saying that it is not illegal anymore simply because states are not following federal law. I think the fact that the Controlled Substances Act is involved, it brings us not just in terms of the category of illegality, but into the realm of how do you test the fit? How do you test if Congress is, like, prohibiting chewing gum or caffeine on the one hand, legal substances, versus substances that actually do have intoxicating, mind-altering effects? But, Ms. Harris, one of the difficulties that I think is, and this kind of takes Justice Gorsuch's question one step farther, in this case, I know we're talking about marijuana, but obviously the statute applies more broadly to other things that are scheduled, some of which can be taken lawfully or unlawfully. I take it you're saying marijuana can never be lawful because it's on Schedule 1, and even if it's on Schedule 3, the government's saying it wouldn't be lawful. Justice Sotomayor asked you about someone who takes Ambien to sleep, so let's assume that someone takes their spouse's Ambien prescription. The spouse takes it too, lawfully, with the prescription, but then, you know, you take it unlawfully because you break into your spouse's Ambien jar. So, I take it that the one would fall under G3, and the other, who had the prescription, would not, right? That's correct, because, for one, it would be illegal, and then there's sort of ancillary questions about the use, by one, of habitual drugs. Okay, but I guess, so my question is, I agree with you, and I think this is what Rahimi says, that legislatures can regulate to keep guns out of the hands of dangerous people, but when I look at this statute, and when I look at what the qualifications are for being listed on one of these schedules, they're all about public safety, you know, they're about reducing addiction, and the example that I just gave you about the Ambien is important to me because it's not the drug itself, in the circumstance, that's causing the dangerousness. It couldn't be, because if my husband has a prescription and I don't, what is it about Ambien itself that would make one of us more likely to be dangerous? It's not. It's the lawfulness. And so, too, here, with the marijuana, I just don't see anything in the scheme that actually reflects Congress's judgment that this makes someone more dangerous. Okay, let me help on a couple ways. One is, I think that there's two parts of this. One is the fact that the Controlled Substances Scheduling Scheme does consider that long-term effects of use, I think, is important. I think that is important because it does reflect a determination that, especially if you are regularly and routinely using these illegal drugs, there are serious side effects. I would point you to the Third Circuit's Harris decision when you look. If you think that there should be a more tailored assessment of who is dangerous, their questions are replicating the various questions that are being answered through the Controlled Substances Act regime. And second of all, the Third Circuit's not Congress, and nothing about the scheduling process suggests that the Attorney General or his delegee has to make a decision that a drug, that the psychological effects, I agree with you, everyone would say that any drug can have long-term psychological effects. But there's no indication that that's what was motivating the Attorney General or Congress. This just wasn't about, the gun control act just wasn't about dangerousness. It wasn't something that the legislature thought it needed to consider then. Respectfully, I think these are on all fours with respect to considering dangerousness. In the Gun Control Act, the fact that it's habitual users or addicts, and I think under the theories that are being floated, you would have a real problem justifying even disarmament of addicts under G3, because I think that it's reflecting a determination that frequent and habitual use of illegal substances, not only above and beyond the determinations that are made to schedule them, but potential involvement of the illegal drug trade are real problems. And just one other point on this. I think this is a smaller gap in between the move that's being made that's supported by post-ratification history, making the same judgment in state after state, than what the court did itself in Rahimi, where again, in Rahimi, there was no founding era history of disarming domestic abusers at all. It was treated as a much lesser offense. It was punished, if at all, by surety laws, and the court relied on the going armed laws as saying that's an even sort of more different danger. The danger there is brandishing your weapon publicly to terrorize the people, versus in Rahimi, it can be sort of conduct in your home. So I think if you're looking at the fit between the danger involved in here, I think that provides it. And just one thing on how would you otherwise figure out who is dangerous in this situation, I really don't know how this would work on an individualized basis. The Third Circuit's approach seems to rely on the kind of pharmacological judgments that are already being made within the Controlled Substances Act, but how are you going to find a reliable way of figuring out this person had a particular type of marijuana or other drug from an illegal source? At what concentration, who knows? At what point in time, who knows? If there is some sense that you have to have a dangerousness determination for each type of person to track it, I think that's a risk. What about each kind of drug? Is it the government's position that if I unlawfully use Ambien or I unlawfully use Xanax, then I become dangerous? I will just point out we have never prosecuted anything on the Third and 116th. Well, but the question is would it violate the Second Amendment? And what is the government's evidence that using marijuana a couple times a week makes someone dangerous? Okay. Just with respect to marijuana, I'll take that first, but I'll just say my backup is I think Schedule 1, 2, and for marijuana, we have not made a policy choice with respect to what's happening, but I think we could very easily justify those threshold categories, whatever you want to do with further down the schedule. The reason is for the dangerousness, all of the things that go into the scheduling decision include potential for abuse, the effects of potential addiction, all sorts of things that go into the same kind of calculus that went into the presumptive disarmament of the mentally ill or other things that affect your mental capacity and affect your ability to use firearms safely. And so if the court is saying, well, mind-altering drugs aren't a sufficient proxy for dangerousness or Congress cannot make a determination, including one that's backed by the Executive Branch scheduling process and judicial review, that these types of illegal drugs not only have particular mind-altering effects on the body, they can create a serious hazard for firearms use as the court's precedent shows. Ms. Harris, you're kind of talking about dangerousness being per se because it's unlawful. So I guess that does raise the question, is it just Schedule 1? Is it Schedule 2? How far down does that go? Does it go down to Ambien? My frontline position would be we'd take all of it because of the determinations that go into it. But my backup is if you have a problem with that, you can look with respect to the gradations of the scheduling scheme. And if you wanted to calibrate it further... So some judgment would still have to be calibrated on dangerousness that way, in your view? You could certainly do it that way, and I think we would... But that would be your backup position. Your primary position is if it's scheduled in any way, so long as you use it a couple of times a week, you're subject to disarmament. That is our position, and because of the combined effects of, again, the judgments that are being made that are permissible, backed by post-ratification history and everything else, and also the dangers of the legal... But all of the safety factors that you mentioned, in my mind, come down to the second part of the statute, which is addicted to drugs. Meaning you say there's a danger that you will become addicted or that you're going to act out in your addiction. So why do you need to control this with respect to someone who uses it twice a week? Because... Under your definition, the mere use, and it's actually not twice a week, it's once a week regularly. Because the addiction prong and the unlawful user prong sort of are overlapping, but distinct, and cover two different situations. I understand. I don't know why the second is not more comparable to the historical twin, which had to do with the question of whether you were a vagabond, whether you didn't have any place to sleep ever, whether you were doing something so persistently that the danger would arise. A couple of points. One is the habitual drunkard laws themselves don't gauge addict versus just drunk all the time, and I don't think this fit has to do so either. If you're frequently using heroin, regardless of whether you're addicted to it, it is a fair judgment to make that you are exceptionally dangerous. But with ketamine, same with PCP, same with other things that have those effects. So I guess my problem is it might be a fair judgment, but conceptually, that is precisely what the Bruin test prohibits. That we don't credit the judgments of the modern legislature about who is dangerous and who needs to be disarmed as a result. The entire point, I thought, of the Bruin test was to say that the only thing the modern legislature gets to do is follow the judgments of the founding era legislature around who was dangerous and who gets to be disarmed. So I think your argument sort of falls apart under the Bruin test to the extent that you were saying the reason why these are historical analogs is because the historical legislature was making the same kind of determination. That they were making a determination that these people, habitual drunkards, were dangerous, and you see the modern legislature, the Congress, is making that same kind of dangerous determination, and so therefore, we have a match. And what I'm saying is that can't work because the modern legislature under our Bruin test only gets to do the policy judgments of the historical ones. So we have to see that the historical legislature, going back to Justice Gorsuch's point, was making a determination that someone who only drinks or takes an intoxicant once every other day and is not doing so while he's using a firearm can be disarmed. And if we don't see that, then the fact that today's Congress thinks that that person is dangerous is irrelevant under the Bruin test. Respectfully, I think that would mean that you were overruling Rahimi because Rahimi made an even bigger jump. If you thought that only people who were dangerous at the founding could be restricted now, I think you'd have a real problem with the fact that domestic abusers at the founding were only penalized. No, it's not the penalty, necessarily. It's the policy judgment about who was dangerous. And I thought there was evidence at the founding that there was a concern about domestic abuse to some degree. Maybe people weren't being disarmed as a result of it, right? Well, the problem is that it was a determination that they weren't dangerous enough to be imprisoned or subject to disarmament. Right, but that's not what I'm saying. If you do it at that level here, then you are – you don't even have that original point. In other words, you don't have the determination that people who are doing what today's Congress says is dangerous were dangerous to people at the founding. This is Justice Gorsuch's point, right? The dangerous people at the founding were well beyond just one, you know, item, one intoxicant every other day. So without that, I don't know how you can even begin the conversation of how we punish those people. Is there a match with regard to what can be done about them? You have to have a policy judgment at the founding that matches the policy judgment today under the Bruin test. Right, and we agree with the Bruin test, but the policy judgment is at the founding, people who are using intoxicants in a dangerous way in a habitual fashion can be subject to various penalties from confinement and imprisonment. And 922G3 is similar to that judgment. It is saying habitual illegal drug use, even if it's not to the exact same point as alcohol, which is legal, which is not subject to the same determinations, is enough on all fours. And I think the other plus factors – I'm sorry, what do we do about the fact that wrapped into that is your view of illegality of doing a lot of work when the government itself controls that determination? I don't know that you can say that this matches because the government today has determined that this particular substance fits in the schedule or is illegal because the government controls that. The government controls that subject to judicial review and much more strict findings than were present at the founding for habitual drunkards who didn't have to be deemed dangerous. There weren't any considerations of what are the public safety concerns with respect to habitual drugs. But to present your argument both except what was happening at the founding and distances itself, I think that's a problem. You've said many times this is not like alcohol, this is different from alcohol, this is illegal. And I say, okay, well, where are the founding analogs that do what is happening here? Right. And the illegal drug problem did not emerge at the founding. And so I think the fact here that post-ratification history, we're not trying to get to the original principle from it. The original principle of disarmament comes from the problem of intoxicants and firearms and restrictions on people. But as soon as the illegal drug problem emerged, there is an unbroken history of treating them as similar to habitual drunkards. The two laws kind of merged in terms of how they function. Habitual drunkards and illegal users of drugs, not just addicts, are subject to disarmament. But the original laws that were enacted, including the uniform law, really spoke to addicts. With respect, there's a lot of laws that were not just confined to addicts. At least, I think at least a dozen of them, either a court in the federal government... It seems like most were addicts, not illegal users. But while waiting to my seriatim rounds. Thank you, counsel. Justice Thomas, anything further? You seem to rely quite a bit on the illegality of the marijuana. Yes, but not exclusively. I think it's post-ratification history, illegality, and the way the Controlled Substances Act works to make determinations, plus the temporary nature of the restrictions. What about other unlawful or illegal drugs, such as anabolic steroids? Anabolic steroids, I believe, are either Schedule 3 or Schedule 4. So I would give similar answers to Justice Barrett with respect to my front line and my backup. I think the front line is, there are the same kind of judgments that are being made. My backup is, if there are concerns with respect to how you go down the schedule, the government only cares really about prosecuting Schedule 1 and Schedule 2, and that's the tightest level of determination. You have to find a serious danger of abuse, and any sort of alternative approach is going to throw out the heroin, the fentanyl, the ketamine, those kinds of things. So other than the danger of abuse, does there have to be some sort of implicit danger in the drug, the effects of the drug itself? That is usually part of the scheduling determination, so it includes the addictiveness, but also you can look even at the recent Notice of Proposed Rulemaking with respect to marijuana, mentioning that DEA in this process normally comes forward with public safety evidence with respect to other risks, and so that is part of the calculus, and I think is pretty tight in it. Thank you. Justice Alito? Most of the most commonly used illegal drugs either had not been invented at the time of the adoption of the Second Amendment or the adoption of the Fourteenth Amendment. Heroin was invented in 1874, cocaine 1855, methamphetamine 1893, fentanyl 1959. Marijuana existed, but my understanding, yeah, hemp was grown for industrial purposes. My understanding is that it was not consumed to any degree by people in the United States until at least the beginning of the 20th century. Is that consistent with your understanding of the situation? That is correct. So we don't know what the founders, what those who adopted the First Amendment or, I'm sorry, the Second Amendment or the Fourteenth Amendment thought about illegal drug use per se. Correct. There's a lot of talk about alcohol. Do you think that the regulation of alcohol is exactly the same as the regulation of illegal drugs? Isn't, doesn't alcohol, isn't alcohol, doesn't it have a different place in the history and culture of the West? Aren't there a lot of people who consume alcohol in moderation and have done so for centuries for purposes, primarily for purposes other than the effect that it has on one's brain? Absolutely, and I think that's why the post-ratification history is so difficult for respondents here with respect to the difference between illegal drugs and the history of alcohol use in moderation. Now as to Justice Barrett's question about Ambien, which I think is quite important, do you think that as a practical matter it is feasible for there to be as applied challenges to the use of every drug on this schedule? No, and I think Chief Judge Colleton's recent dissent in Laveena illustrates a lot of these problems in terms of how do you know exactly how much someone's taking, if it's an illegal drug, what's in it? How do you know exactly what the concentration is? What else are they mixing with other things? At what point do you might have a tipping point situation where someone goes into a greater risk of addiction or having additional mind-altering effects? These are really hard judgments, and those are the kind of judgments that go into scheduling determinations. 922G sets out a whole list of categories of people who Congress presumably thought created a special danger with regard to the possession of drugs. Do you see a ground on which one might say an individualized determination is required for G3, but not for any of the other categories in G? I think that would be difficult, and if you did so, you'd be taking down G2, which is particularly hard to fathom. That's fugitives, so I don't know how someone would say how dangerous is this particular fugitive in the moment, like did they just get scared, what's going on? Or other parts of G4, and then there's a lot of issues with respect to G1, but I think we could all agree it would be passing strange to suggest that it's constitutionally required for serial murderers to be subject to individualized dangerous determinations for Second Amendment purposes. Thank you. Justice Sotomayor? One question. The other side has conceded that you can have laws that prohibit people while they've taken illegal drugs from possessing a firearm. That's correct. There's no argument about that. I believe that's correct. And I think they've even gone so far to say you can prohibit a drug user from possessing the gun while using the drugs. They seem to suggest that, yes. All right. So really the question is whether someone who possesses the gun and drinks socially at a bar, drinks socially somewhere else, takes a stick of marijuana at a party, whether you can prosecute that person? Respectfully, not quite. I don't think it's a question with respect to casual bar drinkers, which we think are on different footing. But let's take the person who has marijuana at a party. If the person is doing so habitually and repeatedly, they are...  Even though the gun is somewhere else. That is correct. All right. I just want to know what your... Justice Kagan? Terrace, I think I'd like to know more about how controlled substances are identified. I mean, the Controlled Substances Act is obviously not written with 922 G3 in mind, right? It's like the separate statute, which presumably has its own purposes and methods and so forth. And I mean, one of the things that might be considered in determining whether something is a controlled drug is a person dangerous when that person is on the drug. But I guess I would be surprised if that was remotely the primary thing. So could you just tell me about the whole range of things that are considered in deciding whether something ends up as a controlled substance? Yes. And it's in 21 U.S.C. 811C as sort of a list of criteria. And while they don't specifically list dangerousness, I'll get to why I think they're a good proxy. It lists things such as the potential for abuse and addiction, the state of the science, the pharmacological properties, the history and pattern of abuse, its scope and significance, public health risks, whether the drug is a precursor for other illegal drugs. And in the course of the determinations, as I mentioned, these are not just subject to judicial review through the APA process and also subject to rescheduling challenges. But in the course of the process, it's obviously a dialogue among agencies with respect to that does consider such things as DEA's views, which, again, tends to consider connections to public safety and crime. So again, the intuition that what they're focused on is what are the effects, what are sort of the mind-altering effects of this particular drug and how dangerous is it when you're on it is a fairly tight fit for such other categories, including the mentally ill, which this court has said is presumptively legal. I think it would be hard to say, no, you can't, you know, it's not enough to say there's this kind of risk of abuse, this kind of public safety concern in general, and say Congress isn't doing a good enough job because it's not specifically considering exactly how dangerous is this particular drug when mixed with firearms. The point is it's dangerous at any level when it's being used in an illegal way. Okay. So a different question. In thinking about these analogs and what counts and what doesn't, do you recognize a difference between statutes that go to public safety, like we're really afraid that this person is going to commit crimes against other people, and statutes that go to what we might call public order? So there's a person who keeps on falling down dead drunk in the town square, and we want to remove that person from our environment, that sort of thing. You know, it seems to me that those are two different kinds of concerns, which might end up in the same statute or might not, and how do we think about that in terms of the analog that you're pointing us to? I think that's a valid concern. I think it's one that Blackstones recognize with respect to surety laws, and I think the court should be attentive to it, but the answer here is I think the overlapping nature of the historical restrictions and what they sound in. So the civil commitment laws, I think, are the easiest example I'd give you. They're focused on habitual drunkards. I think it's very clear to say that the reason is, as Blackstones sort of would have put it, the fear that people are going to be out and about sort of terrorizing the public or doing other unsafe things, similar to the mentally ill. And the vagrancy laws, I will obviously spot you that there is a wider range of concerns within them, but I think you can piece apart the different purposes, both with respect to some of the manner of handling them and just historically how those laws were understood with respect to specific categories of people. And then three, I would say the post-ratification history can help you distinguish between is this public order, we don't like this kind of person being around for aesthetic reasons or whatever it is, or public safety, we think there's a real danger for having this kind of person on the streets or at liberty without restrictions. And I think the post-ratification history here, and again, the fact that habitual drunkards laws translate very closely into the illegal drug user laws, as soon as that problem emerges in the early 20th century, late 19th century, it's another way of telling you, this is how you do the calculus. And I don't think it can be throw all the laws out the window or you have a problem with surety laws in Rahimi, because they covered all sorts of stuff. Thank you. Just a couple quick questions more, sorry. No. 922 G3 has two prongs, as we've discussed. One is you're an unlawful user and second is you're an addict. And you prosecuted Mr. Hamadi only under the first prong, unlawful user. You're asking us now to understand that prong to mean an habitual user. What's left of the second prong? Do you render it superfluous given that an addict is defined by the statute as an habitual user? So, two pieces of this. One is not superfluous. An addict is someone who has an uncontrollable urge to use the substance regardless of whether they have access to it at a particular moment in time. You can be an addict and not be an unlawful user because, for instance, you're in a treatment  I thought the CSA definition of an addict was any individual who habitually uses a narcotic drug so as to endanger the public morals, health, blah, blah, blah, blah, blah. Yes. So, the second part of this is, I think Respondent is being very careful to say we're not actually, no one thinks that that is the actual operative definition. I don't think you could because it says narcotics. It is obviously not the definition that Congress is using. It's limited to narcotics for the purpose in the Controlled Substances Act of dealing with treatment facilities. So, the ordinary meaning that's been adopted by the government with dictionary definitions and all the courts of appeals is not that. It does cover both concepts. It covers unlawful user if someone judged by the objective criteria of their frequency of use, an addict is someone who has an uncontrollable urge. They can overlap, but they are also indicate there are situations as perhaps here where I've got it. I've got it. Thank you. Okay. And then secondly, your backup argument is, well, maybe schedule one and two. We really need those, but not schedule three and the rest of the schedules. If that's the case, what do we do with this case, given that, yes, it's presently a schedule one drug, but the government itself is considering rescheduling it to a schedule three drug? Why bring this case? Why is this the test case? Why is this the test case? I mean, one is that, first of all, at the time when the offense was committed, marijuana is and was a schedule one drug. Two is the government has not made final decisions with respect to what to do with marijuana. But I think something that is clear from the NPRM, at least, again, bracketing like what happens in ensuing stages, is that even schedule three drugs, which include things like ketamine, the difference is they have some medically accepted uses. Not that they're not dangerous. Not that they don't present. No, I understand that's your primary argument is they all count, but your backup argument is we'll stop at schedule two. I don't know why, but okay. But the drug that is involved in this case might wind up being a schedule three drug tomorrow. Yes. I understand that. And I think what I'm saying is not so much there's like a hard and fast special magical Second Amendment rule that says schedule two and no further. It's just if you wanted to sort of set a, if you wanted to rule out like schedule five or schedule four for Ambien, the cutoff with respect to dangerousness does diminish. And I think the court could say you could bracket potentially as applied challenges if you wanted to do that. I'm just saying this is a fallback. It's not the government's main position, but I think when you see the way the scheduling works and the statutory criteria. I understand that. It's just an odd case to have chosen to test the principle when the government itself is potentially rescheduling it as a drug that it wouldn't think would qualify under at least its backup argument. I think we would not concede that it wouldn't qualify. I think the government has to make a decision with respect to their risk potential of marijuana and other externalities. Assuming again, this is a process that has not yet unfolded, which I can't come into any detail. Thank you. Justice Kavanaugh? In response to Justice Alito, I think you said that drugs are distinct from alcohol for Second Amendment purposes, although there's some similarities. Is that accurate? Yes. And I would say that, yes, I can elaborate. Please elaborate. Okay. Thank you. So drugs are similar to alcohol in the sense that there is a similar history and tradition with respect to identifying people who, by use of the intoxicants on a habitual basis, present on the how and why spectrum, special danger of misuse. Drugs are different in a couple of ways that I think make this an easier case. One, we've talked about a lot, it's illegality. The externalities and additional features of being involved in the illegal drug trade increase the risks. And there's also an additional notice requirement that makes this unlike, you know, you're doing caffeine or sugar. You know that you are already using something that's unlawful to possess, and I think that helps clarify the boundaries of the prohibited conduct. Two is the post-ratification history is worlds apart, as the question with Justice Alito illustrated. There is no post-ratification history or a history of saying habitual drunkards, but also anyone who casually drinks on Fridays or sort of who drinks at parties can be disarmed. That is starkly different from the tradition with respect to illegal drug users. Now Respondent has pointed out that some of them cover addicts, but I think the clearest ones that I would give you that definitely cover unlawful drug users and hark to the time that the problem existed are states like Hawaii, Maryland, Maine, Minnesota, Missouri, Nevada, New York, Ohio, Tennessee, Utah, West Virginia. There's a bunch of them. I could go on with respect to other ones. I think those are the clearest, and that shows that there is a historical judgment that illegal drugs are different, again, for kind of the reasons we talked about for the Controlled Substances Act. There's a judgment that because of their dangerousness, because of the abuse potential, because of other effects, they're unsafe at any level, and it's really hard to figure out at what point does that come. Do you agree that there's more of the state laws, though, target addiction than simple user? I'm not sure I would concede that. I think it's a little hard to parse exactly what all of them cover. I think a lot of them do cover addiction, but a lot of them also cover unlawful users, and I'm not sure that would be dispositive when, if you're looking for a post-ratification consensus, you'd have to take the position that, like, all of these laws that are pretty longstanding for people who are near habitual users of illegal drugs are unconstitutional. Assume, even though I think you disagree, I know you disagree, assume for a second that there is a history of drug addiction, drug addicts being disarmed, but not so much for users. Just assume that for a second. Then I go to how you define the terms in this case, and this is picking up on something Justice Gorsuch was just asking, but it seems how you define drug user merges with addict in the sense that you've added the word habitual, and then when you turn to the definition of addict in the Controlled Substance Act, it does say someone who habitually uses any narcotic drug so as to endanger the public morals. That's enough. And I don't know how a habitual user is distinct from a habitual user who endangers the public morals. Right. So if that's true, the two definitions merge, that helps you on the history, if I'm right, in the hypothetical I posed about the history being really targeted at addicts. A couple responses. One is we resist the idea that the Controlled Substances Act definition itself is ported over. The part of the Controlled Substances Act that is actually ported over is just the definition of illegal drugs. That's because the definition only covers narcotics. That would be a real problem for us in deciding who is an addict versus an unlawful user. Second, with respect to how clear the definition, I mean, I would remind the court, the case comes to the court with the proposition universally accepted by the Court of Appeals that someone who repeatedly uses marijuana multiple times a week is in the heartland of an unlawful user. And when you're trying to tease out who is an unlawful user versus addict, I agree with you. And why are they not in the heartland of an addict? So just parse that out for me. Because it is not clear whether Mr. Hamani could voluntarily cease the conduct. Addict is defined by sort of an internal compulsion to use. An addict can include someone who isn't actively using right now, but has an uncontrollable compulsion to use whenever they get access to something else. So is addict misdefined in the Controlled Substances Act then? It's defined correctly for the purposes of that Act, but Congress did not port that definition over into 922 G3 because, again, the only thing it ports over is the controlled substance. And this is not sort of an unusual view. It's what the Court of Appeals have recognized based on the dictionary definitions, that this is an overlap. It may well be overlapping categories of people, but we're giving them distinct meanings, and that this is something that constrains the government in prosecutions, that an unlawful user is judged by a high frequency of use. That's the objective test. Let me, on a different front, mens rea. How does mens rea work here given rehave? What do you have to prove that the defendant knew about habitual? Here's what you have to do. One, you have to know that you're using an illegal drug, and I think that's an important constraint just right out of the gate. Two, you have to know that you're using with how many times you're using it. You don't, in the government's view, have to know the legal definition of habitual, but you do have to know, like, if I use marijuana four times a week, I have to know I use marijuana four times a week. So the conduct that would put me in the category of habitual, I must know. I think these are virtues of the approach here. The government doesn't normally like rehave a lot, but in this particular context, I think it helps impose meaningful limits to the extent the court is concerned with how broadly unlawful user goes above and beyond the constraints courts of appeals have identified, and this is something Chief Judge Colleton also pointed out. The knowing requirement does work here. That is important. Do you think the government could prohibit a habitual drug user from owning a car? Owning a car? I think that, I guess there would be various challenges with respect to takings and other types of property, and I think you would have a different, probably not, but the question for a second amount of purposes is a different one, which is, are you someone who presents a special danger of misuse in that tradition? So for takings purposes or whatever else the constraints are in that context. It's just a danger to have drug users, obviously, driving cars. And I don't think you would find a history and tradition of saying, I mean, I think you could say there's a tradition of confinement and other restrictions, but with respect to the Second Amendment, the question is, do you present a special danger of misuse for firearms because of a historical category? Just like for felons, you probably wouldn't say you can't have a car, but as the court has recognized from Heller onwards, it's presumptively lawful to identify felons and the mentally ill as categories that may present a special danger of misuse. Thank you. Ms. Barrett? So, Ms. Harris, when you were going through with Justice Kagan the considerations and the controlled substance of that for winding up on one of the schedules, there are a panoply, right? And you can wind up for one reason and maybe not for another. Is proclivity to violence expressly one of the things that's taken into account in putting a drug on the schedule? It is not in the statutory criteria. The way I do think it often works out is the DEA may provide evidence with respect to the drug in connection with crimes, but obviously it's not one of the fixed statutory criteria. Again, I don't think that's a problem for the reasons we've discussed, which is you also don't have findings with respect to the mentally ill or other categories. I mean, I understand that. I think where I'm stuck, I agree with you that you don't need to have just alcohol because that's all there was at the finding and that would be trapped in amber. Let's say that I think that the principle is if you have reason to know that someone would pose a risk of violence is dangerous, that the legislature can disarm. I guess when I look at these drugs, however, I mean, robitussin, Ambien, Tylenol with codeine, testosterone, Adderall, I mean, none of those drugs strike me, I mean, I'm not a pharmacologist, but none of those drugs strike me as drugs for which it is obvious that a risk of violence would ensue. Is it your position that all of the drugs that I just mentioned would pose a risk of violence and dangerous behavior? So what I'm saying is those drugs in Schedule 4 and Schedule 5... Oh, actually, Adderall is in Schedule 2. Okay. Just with... Yes. I'm sorry. I'm less familiar with Adderall on the scheduling, but with respect to these categories of drugs, whichever schedule they're on, you have to be using them habitually and not for their prescribed purpose. So yes, our position is if you are in that category, you are doing something that is... So it's the lawfulness because what if you're a college student and you take your roommate's Ritalin twice a week because you think it's going to help you take exams? Yes. And I think we're going to get to a place where you're into ketamine and other drugs, ketamine being Schedule 3, it's a lesser version of PCP. So the problem is that if you take Adderall, then you slide into other drugs? I think it is a problem of who decides what the adequate proxy for dangerousness is. And if you wanted to go on... But you said, and I think it's clear when you look at the Controlled Substances Act, dangerous is not necessarily the primary reason why, or even a reason why all of these drugs land on the list. And so I guess my concern is, let's say that I think Congress could make a determination maybe, I don't know, I mean, there was just an article in the New York Times about the dangers of marijuana, and maybe that's true. Maybe THC concentrations are higher nowadays, and that does have bad effects on, bad mind altering effects, and maybe it gives rise to violence. I just don't see that, my concern, and maybe you can dispel it, my concern is I just don't see that that determination was made here. I guess I would point you to, again, if you wanted comfort with respect to marijuana in particular, the whole history of rescheduling, the determinations made with respect to that substance, et cetera. And I think the other thing to consider is... And where does it say that it leads to violence? There are... In the history. Well, first of all, I guess I'd point to the court's cases, many of which are cases in which there is a strong connection between marijuana use and violence, but I would just take a step back and say, if that is the key, if you have to have some determination that, say, the mentally ill or particular drugs present a risk of dangerousness as opposed to the common sense notion, backed by all of this evidence, backed by these processes, that when you are frequently using these mind-altering substances, you are in the class of people who present a special danger of misuse, just so long as you're habitually doing it. I think that's more of a guardrail. There's no such thing for habitual drunkards. No one was going around saying habitual drunkards are, as a class, unsafe because the justice of the peace isn't saying this particular habitual drunkard is too unsafe to do anything. Actually, I'm glad you asked that. This is my last question. This goes back to your colloquy with Justice Alito, and you were talking about how as applied challenges would be unworkable. What about as applied challenges? Let's put aside the possibility of as applied challenges being required as to each individual defendant, an as applied challenge to Mr. Hamani in particular. What about an as applied challenge just to that particular drug? Why can't Mr. Hamani simply say, you don't have to take into account all of my personal circumstances, but, you know, government, I would like to put you to your proof about whether marijuana has an established link to violence? Right. And I think if you look at the Third Circuit's opinion in Harris, the kind of questions that you would adduce to answer that question, unless you are not willing to accept a connection, the intuitive and historically grounded connection between intoxicating substances and the dangers they present, and the idea that they are in fact dangerous and might lead to violence, I think you have a real problem with that. The person with robitussin shouldn't be able to, who's caught with robitussin and uses it for coughing and sleeping, you know, three nights a week. That person can't make an as applied challenge. I think the government is willing to entertain the idea, as we would with like sugar or caffeine, that if there is not, if there is not sort of a factual record, but I think here, again, you can either carve out Schedule 5 or do some other things. But you're not rejecting out of hand the possibility of as applied challenges to the particular drugs, you're just resisting that it would apply as to marijuana. I'm resisting the idea that it could be constitutionally required for Second Amendment purposes, because I think you would be fundamentally altering the Rahimi framework in a problematic way by discounting the ways in which the modern analog of 922G3 is more tailored, and only focusing on the idea that you need like some exact comparator as if you could go back in time and figure out exactly the mental effects of intoxication to figure out how violent someone is. I think that's an impossibility. Dr. Jackson? Well, I guess I, maybe I just don't understand how the tests work anymore. Maybe it's post-Rahimi, I'm not sure, but it seems like you're asking us to trust Congress's legislative judgment here, that unlawful drug users pose a heightened risk of misuse, but that this test really doesn't provide us a way to check that in any meaningful sense. And I guess the benefit of the pre-Bruin kind of means in scrutiny is that you've got to the bottom of whether what Congress was actually doing here was legitimate, and whether the means that they had chosen, the disarmament of this person was tailored, sufficiently tailored to that aim. And what's worrying me is that the current Bruin test modified by Rahimi or whatnot is not allowing us to assess that, and that's really the problem in this situation, that the concerns, the questions that you're being asked seem to all relate to people's concern that even if we all agree that Congress can legislate to disarm people who are dangerous as a general matter, that this person in this circumstance really is not dangerous. And your test doesn't seem to get to allow us the way you're talking about it to assess that. Can you help me with how the means in scrutiny analysis is being folded into Bruin? Sure. I don't think the means and analysis is or should be folded into Bruin. But then how do we keep it from having this very situation where it just boils down to us believing what the modern Congress says about whether or not someone is dangerous? We would also reject the trust us position. Okay. Here's the guardrails again. I think I would start with post-ratification history because history is the touchstone of the Bruin inquiry, and the court has repeatedly recognized that when you have a principle from the founding with respect to how to classify which kinds of people present a special danger of misuse, it's not a law trapped in an amber situation. You don't have to accept the founding generation's judgments as to exactly who is or is not dangerous. Right. But your principle is just the founding era identified certain people as dangerous. Your principle has to be specific enough to allow us to adequately or accurately match it. Yes. If it's not, then it really doesn't do any work to look at the founding. We just look at today's judgments, and we do the kinds of policy analysis that we used to do, which is basically what I hear you saying back and forth with Justice Barrett. Right? We're just looking at, like you say, there's a really good reason to do this, and Congress's judgments are grounded in important policy determinations. All that's true, but that's not what the Bruin test is asking us to do. Respectfully, I'm not saying Congress is doing great work here. I'm saying the tests are in addition to post-ratification history, which tells you the principle is a lot more specific than, here's a dangerous category of people, have at it. What is the specific thing about habitual drunkards as a category, obviously identified at the founding, that is parallel to the every other day marijuana user here? It is that when you habitually use intoxicating substances, you can present special dangers that warrant confinement or imprisonment or other restraints that are greater than what 922 G3 is doing. Yes, but you're just defining habitual user differently in those two situations. I mean, you've just defined away the problem. Yes, fine, when you habitually use, but the founding people said when you habitually use, you're falling down drunk in the street. It's like whatever Justice Gorsuch identified at the beginning, that's what it means to be a habitual user back then, and therefore it presents a category of dangerousness. That's not what we have here. You can't just redefine it and still say there's a match. So two problems with that. One is, again, I think if you think that there's not close enough fit between the principle identified and the judgment of post-ratification history of many states that for a long time have treated unlawful, illegal drug users as of a piece, then you have a real problem with Rahimi itself. Well, that may be it. I mean, I guess I'm concerned that Bruin and Rahimi are going to be allowing for arbitrary identifications of analogs and producing inconsistent results. You were here in January with respect to the Wolford case when you argued that historical anti-poaching laws were different enough from what Hawaii was doing that it's unconstitutional. Here you're arguing that historical laws that have nothing to do with guns, very little to do with unlawful users of intoxicants as, you know, was going on in the history, are similar enough to cause this law to be unconstitutional. I don't understand how this works anymore in any meaningful way. Okay. Wolford is a case about a handful of founding-era putative analogs that missed out on what we considered to be the relevant principle. Yes. Well, you considered. What I'm asking you is how does that, how do we know what is the relevant principle here versus there?  I think there's a couple of ways of figuring it out. One is with respect to how it's liquidated in post-ratification history. I think that it is a far superior approach than what Justice Gorsuch aptly described in his Rahimi concurrence as a sort of free-for-all in which courts of appeals are imposing or having free will to impose their own policy preferences. So I think that is an important check. Two, we're not just saying trust us, Congress. We're saying the process by which you test whether illegal drugs are illegal are deemed dangerous in whatever it is, a range of things, is something that provides a check for specific fact-finding that well exceeds the kinds of determinations that were made with respect to being a habitual drunkard of the framing. It seems like people have an idea of habitual drunkards as like a very defined class. That was not true. Habitual drunkards were within the judgment of a justice of the peace or magistrate with respect to some of their own personal experience. There's no judgment that like a habitual drunkard is specifically dangerous. The Ludwig decision shows that the migrant of cases are not even saying someone was incapable of handling their own affairs. Thank you. So that is a helpful check. Thank you. Thank you, Counsel. Ms. Murphy? Mr. Chief Justice, and may it please the Court, the question in this case is a narrow one. Can the unlawful user prong of 922G3 be constitutionally applied to Ali Hammani? The answer is no. In fact, it can't constitutionally be applied to anyone because the statute fails to provide fair notice of what makes someone an unlawful user of a controlled substance to be stripped of their Second Amendment rights. But even assuming the statute could be applied to Mr. Hammani consistent with due process, it could not be applied to him consistent with the Second Amendment. The government reads the unlawful user prong to cover anyone who is engaged in habitual use of a controlled substance. But the only historical tradition it has offered is one of imposing restrictions on habitual drunkards. That entire line of argument rests on a category mistake because the laws to which the government points applied only to habitual drunkards, not to habitual drinkers. Indeed, the whole point of the doctrine was to distinguish those who consumed alcohol frequently, but mostly in moderation, from those who so habitually consumed alcohol to the point of intoxication as to impair their ability to function even in whatever moments of sobriety they may have had. And that distinction was critical, as deeming anyone who regularly consumed alcohol a habitual drunkard would have given the government sweeping power to subject much of the populace to hard labor, guardianship, civil commitment, and incarceration. Now to be sure, the habitual drunkard tradition may well support disarming people who are addicted to a controlled substance, which is in fact the dominant approach in the states today. And perhaps it could justify a categorical approach as to certain substances if the government is able to actually prove that a particular substance is in fact so addictive and dangerous as to make anyone who regularly consumes it akin to a habitual drunkard of yore. But it cannot support disarming someone based solely on the fact that he consumes a few times a week something that Congress has designated a controlled substance. I welcome the Court's questions. The government takes the view that, or seems to suggest that your argument boils down to a facial challenge on the statute. We are making the argument that it is unconstitutional as applied to Mr. Hamani. Some of the arguments that we make may mean that it is unconstitutional as applied to a lot of people or even perhaps most people, but we are not pointing to some deficiency in the statute that's not applicable to Mr. Hamani and saying that that's a reason to invalidate it. At the end of the day, we don't, I mean, my client just wants to see the decision below affirmed, whether that's done on facial or as applied grounds is not of particular importance to us. Well, I know your client just wants to prevail, which is understandable, but your argument, it seems to me, I mean, why doesn't it apply to any drug, whether it's PCP, methamphetamine, whatever? It seems that, again, to the extent that you're overriding the judgment of Congress and the executive branch with respect to the listing of particular drugs, I don't know why that same approach doesn't apply to any drug. So we think the same principle should govern with respect to any drug, but that doesn't mean that the statute is unconstitutional as to every drug. If you take the principle underlying habitual drunkards, the concept that the statute back then required, is somebody drinking to such excess that they can't care for themselves or their affairs, that they've lost self-control, that they're posing a public safety risk, if you apply that, there are going to be some substances where it may be that pretty much anybody who uses them regularly. So we're going to assess those on a case-by-case basis and apparently on an individual-by-individual basis? Actually, we are happy for the government to have two options. It can do it on an individualized basis, which is exactly what the statute contemplates as to addicted to. I mean, you have to engage in an analysis of someone's actual use to figure out whether they're addicted to a controlled substance. But if the government wants to try to say a particular substance is so categorically addictive, dangerous, that you can't use it regularly, okay. But it has to do that under the burden of proof that Bruin assigns it, of proving that the category it has identified maps on to that category of habitual drunkard. It's not enough to just come in and do APA, discretionary, government gets the benefit of the doubt review, because that's eliminating the burden of proof that Bruin provides to the government. Well, I was just going to say, I don't understand the determination in every case. But also for other examples, you know, the New Year's Eve example, you can't, you know, shoot a gun in New Year's Eve and all that. It does indicate there's some categories of use that were prohibited at the founding, whether it's habitual drunkards in terms of the illegal use based on particular individuals or categories or geographic limitations. Like today, we don't allow people to bring guns in the courthouses, even if they can say, look, I've never used it unsafely. Or, you know, similar types of restrictions. And you say, well, now those are going to have to be litigated on a case-by-case basis in every individual instance. And that's going to be hashed out in court. Is this drug one that's particularly dangerous or particularly addictive? And it just seems to me that takes a fairly cavalier approach to the necessary consideration of expertise and the judgments we leave to Congress and the executive branch. So I want to be clear about two things. First, we are not saying, we're not arguing that the Second Amendment doesn't allow for categorical prohibitions. That is not our position. And we're not even arguing that Congress couldn't perhaps have categorical restrictions as to particular substances. Our core point is, if Congress wants to do that, then the government needs to prove, with its burden of proof under Bruin, not just that this was a reasonable determination supported by substantial evidence that gets past APA review with highly discretionary we'll assume the government knows what it's talking about, that it has in fact identified the category in a way that maps on to the historical tradition it is in. Well, Ms. Murphy, I don't really understand what you just said. 922G sets out various categories of people who are prohibited from possessing a firearm. And I thought you began what you just – I thought you said to start out that a categorical approach is permitted. Is that correct? Or are you saying that as to everybody in all of those categories, there must be an individualized showing when that person is prosecuted? We accept that the government can take categorical approaches. I think you're going to have to look at each – any given prohibition and examine the history behind it to determine what categorical approach can be taken. But we are not here to suggest that the only time the government can ever restrict the exercise of the right – So as to at least some of these categories, there's no right to an individualized determination under the Second Amendment. Is that what you're saying? I mean, I think that, you know, you could have a discussion in a case involving certain provisions about the need for, as applied challenges, some way to allow somebody to show that, yes, you might have the category right as a general matter, but I am somebody who happens to be outside it. But I think that that's something you confront once you've determined that the government got the category right, which is the threshold question. Did they get the category right as compared to the historical tradition that they are in? Well, I'm not – I don't completely understand that. Can – is it – can – must there be an individualized determination as to anybody who is prosecuted under any of the subsections of 922G? Yes or no? No. That is not our position. Well, suppose Ms. Murphy, Congress tomorrow says, you know, we're afraid that this Controlled Substances Act is not really doing it for us in this area, so we're going to come up with a list of particular drugs that we want to be able to take away people's guns. And the first on that list – I'm going to say I don't know a lot about this drug. I'm assuming you don't know a lot about this drug. So what I'm going to tell you about this drug, let's just assume is the truth about this drug.  So it's – the drug is ayahuasca, and it's a very, very, very intense hallucinogen. And the episode lasts a very long time. But it's not, let's say, an addictive drug, you know. You can choose when to take it. But when you are in its grip, like, you basically – reality dissolves, all right? And I'm assuming that Congress has a good reason for saying when reality dissolves, you don't want guns around. So – but that, to me, when you give the description of the historical analog, to me, that's going to fail your test. Should it fail your test? Not necessarily, I guess. I would say two things. First, obviously, we agree that you can be prohibited from carrying while you're taking that drug. But I don't think – I don't think that's fair. I don't have a question of carrying. It's like, you know, there you are in your house. You have a gun in your house as well. So you're owning a gun even though you use this drug, let's say, once every two weeks. Yeah, I think that it would be a little bit difficult to show that really using that drug every few weeks is going to be enough to render you akin to the concept that the historical drunkard laws were getting at, which is that your consumption rendered you – we're not saying that you had to be intoxicated all the time. But your consumption impaired your ability to function, even your moments of sobriety. That's what the courts are talking about. They're asking whether – it doesn't have to be addiction. It can be addiction, certainly. But it could also be you're consuming so frequently that, you know, that's really all you do and during the day you're not functioning again. So it's definitely going to fail your test. It may, it may not. But I think, you know, you'd have to look at how lasting the impact is. But if a person is – if what you're essentially saying is there's a substance that leaves a person impaired once every two weeks, but the other 13 days of those two weeks they are perfectly fine, I don't think it's consistent with the historical tradition the government has invoked, just as I don't think that tradition would support incarcerating that person, subjecting them to guardianship, or committing them to a drug treatment facility. Well, what if you personally – I was just going to say, I mean, the hypothetical focused on a particular time period, but I think it could be used every week, not just every third week or every other day. And, again, I think that's something with the judgment about that. You said that's going to be made in court. And that kind of judgment gets made in court all over the country all the time in the hearings that are routinely held to decide whether somebody can be subject to things like guardianship or civil commitment because of their substance abuse. Well, but they're made under the determination set forth by Congress and the executive in statutes. You know, if they want to categorize this particular drug as something that's dangerous, that's not enough for you. Well, that's not enough for the types of civil commitment and guardianship laws the government's pointing to either. It is not enough to just walk into state court and say, this person sometimes uses a controlled substance, and then you say, okay, therefore we will commit them to treatment for substance abuse. There is a process that has been developed in courts that requires all sorts of individualized inquiries into the nature of someone's use and whether it in fact renders them a danger to themselves and others on a regular basis. There is a broad range of determinations like that where we leave the question of its addictive difficulties and the consequences of that to a determination by the legislature with Schedule I, Schedule III, and all that. And in each case, you don't go in and get to reweigh the legislative determination. But the point is to get to the types of restrictions the government is pointing to as its analog. Being able to say your use of a substance has become so extreme that you can be appointed a guardian, you can be committed for treatment. I mean, alcohol was never illegal at those times. So it's not enough that someone's made a determination about the substance. What you had to look at was how the use of that substance was impacting somebody's ability to function in their day-to-day life. It might be a strange question, Ms. Murphy, but do you think Congress that really wants to get this ayahuasca drug, you know, really wants to disarm people who use it, could they pass a statute that says something like this? You know, here are the findings. The findings are we live in a post-Bruin world. And it's been pointed out to us that the best analogs are these habitual drunkard statutes. So Congress says, so we think we've looked at all these statutes and we've looked at the modern-day evidence, and ayahuasca fits our idea of what the habitual drunkard statutes we're getting at. Now, as we just talked about, it doesn't fit your idea. In other words, I'm just going to stipulate that it doesn't meet your test. But Congress say it meets our test, thanks, and that's good enough. I think at that point you've sort of abandoned the Bruin inquiry of saying it has to actually map onto historical tradition, and you're in the world of simply saying Congress can make its own reasonable determinations about who is and is not dangerous. Now, I appreciate there's some on this Court who may think that's the better approach, but I do think once that's all you're asking, you are no longer assessing the question vis-à-vis a historical matter. I've signed on to that. Understood. I do want to follow up on something that Justice Kagan asked. I think the government gave this away when it said that there was no determination by the legislature on the dangerousness of the drug with guns in terms of listing it on the schedules. So doesn't that give away the whole game? I think it goes to show why this Court would have to do, or a court, would have to do its own inquiry. Because the bare fact... But why bother? Meaning if Congress, we can only uphold the law if there is something to defer to. Correct. But if no one has actually done the analysis whatsoever. Correct. And I think it is a fair point. I think it's a correct concession on the government's part that the Controlled Substances Act does not reflect a determination that every substance that is labeled a controlled substance is too dangerous for people to regularly consume. In fact, it represents the opposite. And we can't make that, given for all the reasons that Justice Barrett pointed out, all the different scheduling. You can't really say that every single drug on there, Congress could have reasonably, rationally, whatever. Congress, I mean, the point of the scheduling is to say some of these substances, even though controlled substances, are capable of being used regularly in moderation without making somebody a walking public safety risk. So if you are serious about ensuring that the modern law fits that historical understanding, this law doesn't even reflect Congress's determination that everything designated a controlled substance is inherently the kind of thing that cannot be used responsibly or in moderation. And, Ms. Murphy, I thought your point was that even if it had, even if it did, deferring to Congress with respect to that kind of judgment is what Bruin tells us we're not supposed to do, that you would be abandoning, in a sense, the Bruin test to kind of take the Chief Justice's, what I think, reasonable view of, you know, thinking about what Congress has said and assessing what Congress wants to do and evaluating whether it's doing it in a narrowly tailored way. If we're doing that, then what work does the historical analog have to do? I thought we had to look at the historical analog to constrain Congress in its ability to disarm people today. That is exactly, I mean, that is our core submission, and the government said multiple times today that they agree that they have to actually map onto a historical tradition. And if that is what's going on... And so the question is, how does that mapping happen? At what level does that mapping happen? Sure. And I hear the government saying it happens just at the level of the old cases where looking at people and making judgments about when they were dangerous and should be committed or whatever. And it can't be that broad, I think. We certainly don't think it can be that broad. I think it has to be attached to a principle. So the principle in Rahimi was not simply Congress decided certain people were dangerous. The court focused in particular on the fact that that part of 922G required an individualized determination of dangerousness. Now, we're not saying that's the only way you can map on a historical tradition, but it was that. The court didn't stop at the high level of saying a determination, you know, that there was just a legislative view of dangerousness. It looked at that individualized inquiry. Here, I think that you have to say, okay, you know, what was the historical principle surrounding dangerous substances, intoxicating substances? And when you have a tradition that's all about ensuring that the regular user doesn't get swept up with the habitual drunkard, I don't think you can point to that tradition and say, this is our tradition that allows us to bring the regular user in along with the Can I ask about the tradition with respect to addiction? Yes. Because I think you and the government agree. I want to find places of agreement here. Yes. I think you and the government agree that there is a tradition of prohibiting gun ownership possession by those who are addicted to drugs, correct? Yes. We agree that the historical – I mean, we agree that the historical tradition of habitual addiction, which is – I'm happy to talk about the state laws – is really the dominant approach that states have been taking. Well, as my questions indicated, I think you have a strong point there on that being the dominant approach when it started up. Now, then, on this statute, so taking what you just said and applying it to this statute, this statute does cross-reference the Controlled Substance Act, which then does define addict as a habitual user so as to endanger the public morals. Yep. Just leave it at that. And my question is, is that definition of addict good enough, in your view, to satisfy the tradition of prohibiting gun ownership possession by addicts? And if not, what is the delta? Yeah, I think that definition pretty well maps onto the historical tradition. It's a little bit of an unusual definition because it has these two prongs. It refers to a habitual user as someone whose habitual use either is essentially because they're addicted or just is endangering public safety. But I actually think, you know, while that may be a bit of an odd way to think – It says endangering the public morals, which means anything. It does say. I think some – look, if we were here in an addicted-to case, there's some discussion to have about whether some of that language is a little bit broad and a little bit problematic for maybe just a little bit. But I think what the definition is getting at is if your use is so excessive either because you're addicted or if it's a product of choice, either way, if your addiction is rendering you a threat to yourself and others – or your use, your habitual use is rendering you a threat to yourself and others, I think that maps onto historical tradition. So you're good – let me just summarize. You're good with addiction being a tradition and with this definition of addiction being good enough. The only minor caveat I will give you is the government has, in fact, accused my client of being a drug addict. So I don't want to foreclose, like, literally any argument that might be made about the addicted-to problem. But as a conceptual matter –  We don't have a problem with the historical tradition supporting the use – supporting laws that prohibit drug addicts from possessing firearms. The government didn't accept that. They said that that definition doesn't control. In fact, they said it has to be more focused. I think what I – if I understood the government, I think they're focused on the fact that the definition specifically refers to narcotic drugs, which is a narrower category than controlled substances. We aren't suggesting that the definition has to be read, like, literally in hoc verba into the, you know, 922G3. I think you could say that the standard that the definition of addict is accomplish – is setting out for addiction can apply as a controlled substance. And this is actually the way – when the government does prosecute under addicted-to, several courts use this as the jury instruction to give content to what the content – We interrupted Justice Barrett, and I want to make sure you get back to her. Justice Kavanaugh, you can finish. Go ahead. I was just going to give you a variation of Justice Kagan's hypothetical. I have never heard of the drug that she was – Is that real? Okay. Let's imagine that it's marijuana, okay? So let's say that you win this case, and Congress comes back and says – you know, it conducts hearings, it hears all this evidence about the concentrations of THC in marijuana that's made today, documents that marijuana users who use it several times a week have a proclivity for violence, violence with firearms, and then passes the same statute with findings along the lines I just sketched out. Can Congress do that consistently with the Second Amendment? So I think you'd have to look at that evidence itself and decide, does it suffice to show that someone fits this pattern? If they could show that – I have to look at the evidence to see if the person satisfies the pattern? No, the category. If Congress wants to say, we're going to do it at a categorical level, then I think you look and say, did they get the category right? Okay, how do I make that judgment? By thinking about the test that was applied historically. Has the government demonstrated that anybody who uses at the degree of that substance, in that amount, in that frequency, is actually a danger, not even just when they're using, but in their day-to-day life? Are they unable to care for themselves and their affairs? Do I have experts? I mean, if the government wants to do it on a categorical basis, it is going to have to prove up its case. If they don't want to do it that way, then applying the same test on an individualized basis should get you to the same result if they define the category correctly. So the judge would then conduct an evidentiary hearing, hearing from experts on both sides about whether marijuana actually poses a risk of gun violence? I mean, if the government wants to say, we want to set a categorical rule, I don't think it's too much to ask all of them to put it – Matt, could you do that for Matt? I don't – as to some substances, I think it's not going to be that hard. It's just marijuana – we're all here and these cases arise because marijuana, boy, it would be difficult for the government to make that showing when it is the considered judgment of 40 states, the District of Columbia, three territories, and the president that it's not that kind of substance. But you can see that there are some substances that the government would have a pretty easy time on a categorical basis, maybe cocaine, maybe meth. Absolutely. We are not here to suggest that you couldn't ever have a categorical approach as to a particular substance. It's just that if the government wants to do that, I think it has to do it under Bruin. So it could have a categorical approach with respect to Justice Kagan's case. They can come make their case, and then you decide, you know, I think the right test to apply is, did they define the category close enough to the habitual drunkard concept? Maybe, you know, maybe the level of generality is enough to capture your drug. But it's not going to be enough to capture something that is the type of thing that people regularly all throughout the country lawfully use a few days a week, and most states and the president made the judgment that that is not so categorically dangerous that nobody can use it safely. The trial you're contemplating after Congress has gone through whatever it's gone through in establishing the record and making the determination, and then it's going to be re-dedicated in trial. The fact that your client wins in one trial there doesn't mean there's not going to be another trial in another district, and the case won't develop until I suppose there's a conflict among the circuits, and then we would have to evaluate the scientific record. I mean, for one, the government does have to do this anyway as to its scheduling determinations, which can be challenged through APA review. The only difference is they want a lesser burden of proof, which they get in the APA context than they would get under Bruin. They have to defend them in exactly this way. They don't just get to say, trust us, we got it right. Now, if the government's getting it right, I just don't think this is going to be that hard as to the substances that it's pretty clear can't be used on a regular basis by anybody safely. And that's why you're not seeing these cases come up to you, and you're not seeing the lower courts struggle as much when it's somebody who's admitting that they take heroin every day. You know, nobody's getting as concerned about the scope of the statute as applied to certain substances, but applying the test ensures that the government doesn't make category mistakes in the way that the president himself seems to think the government currently has done as to marijuana. Do you think the statute, when with the word habitual added, you make a big deal about that in your brief, really does then reduce to addiction? So, it certainly captured – the addiction problem would be irrelevant at that point because you have to be a habitual user to fall within the definition of addiction. And it would be particularly odd because that's not enough to make you addicted to. You need to be habitually using so as to either endanger the public health and safety, et cetera, or to have lost the power of self-control. So, it's really, you know, the addicted to prong is designed to kind of be narrower, yet all of a sudden you'd have this unlawful user prong that's so broad that it renders that prong irrelevant. I don't think that that's really an available interpretation, a kind of a coherent interpretation of this statute when Congress set out two different concepts that it was trying to get at. Mr. Murphy, I wonder, do we need to get into much of this about how the government could proceed with categorical versus individual or how it applies to addicts? He wasn't charged under that part of 922G3. And all we know – I mean, the only thing we know on the record is he uses some marijuana. We don't know how much or in what potency a few times a week. And why isn't it just enough to say whatever else may be true? That is not an habitual drunkard. We would be happy for the Court to resolve the case on that narrow ground. I mean, I'm trying to be very responsive. I appreciate the Court wants to think about this statute as a whole. But you really don't need to answer any of the questions about the addicted to prong today. And really, even as to the unlawful user prong, all you have to say is either whether the government's thinking about this individually or categorically, they just can't get there simply by saying somebody uses some unknown quantity of marijuana some unknown time of day a few times a week. We are very happy to prevail on that narrow ground. Which sounds to me very much like it is sounding in traditional understandings of this category being overbroad, that to the extent that we are concerned about the perceived mismatch between historical drunkards and regular users, it really is just that Congress' purpose here, which is to prevent dangerous people from having guns, is not, you say, furthered by including this kind of person in that statute. That's right. And that's overbroadness. And, you know, I think under Bruin the right way to say it is it's overbroad as to the historical category. Right. But I think you could kind of get to the same place by saying even if you were doing means on scrutiny, it's overbroad. Right. It's just overbroad in the sense that this particular, at least as to what you've got before you in this case, is overbroad even under a traditional conception of giving the government a little bit more room for deference on its determinations. That doesn't mean the government might not have a much stronger case with somebody who regularly uses a different substance. If you apply the same principle across the board, the government's going to win when it got those categorations correct. So you think the government could say someone's an unlawful user but not an addict as to particular kinds of drugs, and that would be sufficiently connected to a historical tradition that it would satisfy the Second Amendment. That's what you're saying. I think the one way to understand this statute, which isn't the easiest statute in the world to completely understand, but would be that the addictive two-prong is focused on people who use so excessively and routinely as to fit the habitual drunkard category. It's focused on people who do that out of physical or psychological compunction, and an unlawful user can reach the people who do the same thing out of choice. And so either way, you have the same ultimate principle, but you could read this statute as saying one is about addiction in the most traditional conception of addiction, and the other is about abuse, abuse even. And it's just that somebody chooses to spend much of their life in a drunken stupor or intoxicant high on drugs. Thank you, Counsel. Justice Thomas? Justice Alito? You say that there is not a problem with, at least I understand what you're saying, there is not a problem with prohibiting everybody who is addicted to a controlled substance from possessing a gun. Is that correct? We do not have a problem with that. And that applies to everything, every controlled substance. I think the concept of addiction, the determination that's made to show that someone is addicted to something is, I understand, the kind of determination that's going to show that somebody is engaged in the kind of use that renders them at risk all the time. So I just want to be very clear about, you know, we're not conceding at like some generic level, it's because the concept... Seriously you think that being addicted to every single drug in the schedule renders that person a danger? I... You would be willing... You don't think arguments can be made that being addicted to, I don't know, the illegal use of Ambien? I'm not sure you'd be able... If somebody is charged with that, that person couldn't come in and say, well, that doesn't make me dangerous. I'm doing this while I'm sleeping. And this is where we might have a marginal disconnect about, you know, when I think of what would be necessary to prove that someone is addicted to something, it's going to need definition of the Controlled Substances Act that's asking about whether you are a threat to yourself or others. And maybe there's some... Sometimes you just can't make a showing that somebody is addicted in that sense, but if you accept... Can an addict, as to every substance in the list, insist on an individualized determination or not? The statute requires that. I mean, you can't figure... So there has to be an individualized determination. So the mere fact that someone is addicted to something that is a controlled substance is not enough for Second Amendment purposes. I don't know how you determine that someone is addicted to a controlled substance without engaging in an individualized inquiry into their use. Once you've determined that someone is an addict, you've determined that they fit into... No, not as to their use or even their reason for the use, but whether their situation renders them dangerous. I mean, that is what the definition of addict in the Controlled Substances Act contemplates, that you have to assess somebody's use by reference to the impact it is having in their life. So I don't think it works under the statute to say someone's an addict without having engaged in an individualized inquiry into the nature of their use, and that's what's required all across the country. If you want to adjudicate somebody a drug addict who can be subject to confinement or guardianship, you have to actually individually assess their use of the drug. If an individual... I'm sorry. Let me finish. No, no, go ahead. If an individualized determination is required under G3, is it an individualized determination as to that particular individual, or is it as to the drug across the board? So I think the individualized inquiry is to whether you are addicted to a controlled substance. Well, no, I'm not talking about addiction now, just use. Someone is prosecuted for being a user of drugs. Sure. And you say you can't do that, you have to have an individualized determination as to something. And what is this thing that there must be an individualized determination? I want to be clear again. We are not actually saying that the only way to do this is through an individualized inquiry. For addiction, I think it is, because I think the concept of addiction requires it. But if the government wanted to say that there is a particular degree of consumption of a particular substance that it considers virtually anybody who consumes in that quantity to be someone who cannot possess a firearm, we are not asking you to rule out the possibility that the government could make the showing that that category is categorically analogous to the concepts that the habitual drunkard laws reflected. We are not saying the only way they can do it is by coming in and making a case-by-case determination. They can proceed either way. It is just that if they want, whichever way they want to do it, they have to meet their burden under Bruin of proving that they did, in fact, make the right determination. They put either the person or the substance use into the correct category. I struggle to figure out how these individualized determinations can be made in the context of a criminal prosecution. The way in which criminal prosecutions are conducted makes this extremely difficult. Now, the Third Circuit issued a very thoughtful opinion about what they thought was required in an individualized determination. And what they said was that the test is whether disarming a drug user is needed to address a risk that he would pose a physical danger to others. Is that the test that you would apply? That's not necessarily the test. We would ask you to apply a test more akin to the historical one. Okay. What is it? Sure. The test is whether somebody's use is rendering them unable to function in their day-to-day life all the time. Whether it's because they're always intoxicated or because their use is such that it's impairing their ability to function in their day-to-day life. That is what the civil commitment laws ask. They said, is someone a drunkard incapable of taking care of himself or his property? Or you had to prove that a person, by excessive drinking, is unable to attend to business or has lost self-control. You had to prove these things. I'm just puzzled by most of your argument. Suppose somebody — I just don't understand what you're arguing for. Suppose someone regularly takes a drug, and during the period when that person is taking the drug, that person is super dangerous. Congress couldn't — the Second Amendment would not permit Congress to say, that's too risky. It might, and if you look at the laws, the definitions that were used historically, some of the cases talked about it in terms of, is somebody the type of person who's going to take the substance, you know, going to drink to excess whenever the opportunity presents themselves. They're focused on that question of saying, not just are you always drunk, but are you so habituated to it that you are drunk a lot of the time and we can't trust enough for you to just, you know, be around the one day a week, that's why we're going to commit you or have guardianship or have these severe consequences. And so we don't think — I mean, you know, the traditional way, the addiction prong is applied, is to give juries the instruction from the CSA definition, which requires a jury to make an individualized finding about whether somebody's use is impacting the person. All right, well, speaking about — speaking of jurors, this is — these are the factors that the Third Circuit said an individualized determination should entail. The length and recency of the defendant's use during and shortly before his gun possession, the drug's half-life, whether use of the drug affects a person's judgment, decision-making, attention, inhibition, or impulse control, whether the drug may induce psychosis, the drug's interference with a user's perception of his own impairment, the long-term physical and mental effects of the use of that drug. Are those — in a criminal case, would those be submitted to the jury? We are not suggesting that juries would need to be instructed to consider all of those things, but I certainly think the government would say that's the type of evidence we should be able to present when we want to show that a drug was correctly categorized. Experts would — experts would testify on all of these matters, and the jury would decide whether the person met the test for being a dangerous person. I don't think the government's going to need to do that when it comes to a lot of cases and a lot of substances, but — Well, maybe not always, but if that's at issue, is that what's going to be required? Again, I mean, the government can't even put a substance on one of these schedules without having to withstand if somebody wants to bring a challenge to that. They're going to have to prove it up. We're talking about criminal prosecutions and what needs to be shown in a criminal prosecution. I don't know where the line, the Sixth Amendment line, is as to all these things. But even — let's assume that some of them, all the ones that go to questions of science, for example, you would have every single — potentially every district judge in the country would make a finding. And I find, as all of these drugs, I find that this — that the use of this drug, being — that users of this drug are dangerous or they're not dangerous. Every district judge before whom that issue comes up would make a determination on that scientific question. No. I think you can give the jury a standard that asks whether somebody's use is impairing their ability to function, and the government can then choose to present evidence. They can present evidence about their life. They can present evidence about the nature of the particular substance and the fact that it is a substance that carries with it effects for days at a time. It can present evidence, and the jury can make an ultimate determination, just as the jury has to do as to the addictive. It's been said that Congress never made a judgment about the dangerousness of using all of the substances on the controlled substance list. Is that right? I don't think Congress has made a determination that anybody who uses those substances regularly is a public safety risk. Isn't that what Congress did when it enacted G-3? No, because Congress only applies that if somebody's use is unlawful, and so somebody can be using a controlled substance regularly under the Controlled Substances Act, and Congress deems them not to be a public safety risk so long as they got the prescription for the sleep aid and they aren't the spouse who didn't. All right. One final question. In the cases in which we have previously held that the Second Amendment prohibits certain government regulations, Heller, McDonald, Bruin, there have been a lot of the sky is falling arguments about the consequences of that for public safety. In Rahafe, I said that I think that 922G has a more direct and severe bearing on public safety than the issue of whether a law-abiding citizen can possess a gun in the home, or even as in Bruin, carry the gun outside the home. Do you disagree with that? Here we're talking about disabling people like people who have committed felonies. Sure, but I would note that under 922G-3, it's only about five prosecutions that are under G-3. The vast majority of them are under other provisions, and about 80% are under G-1. So I don't think the arguments that we are making today would vastly endanger the government's prosecutorial efforts under 922G. Justice Sotomayor? If you look at the statute, there's two components. Unlawful user of a controlled substance, and someone who's addicted to any controlled substance. Addiction is defined by the statute, correct? It's defined by the Controlled Substances Act, not by the Gun Control Act, but there is a cross-reference which suggests Congress intended the statutes to be read in part. Means any individual who, this is the definition, habitually uses any narcotic drug so as to increase their safety or welfare, or is so far addicted to the use as to have lost the power of self-control. That would go to a jury. That does go to juries. It has to go to the jury. That goes to juries in these cases, yes. Justice Alito's concern about each jury determining is inherent in the definition, correct? It's inherent and inaddicted to prosecution. Now, with respect to who is an unlawful user, I've been surprised that in your cert petition and even in this brief, in your briefing, you haven't really raised the vagueness issue. But it seems to me that the government is sort of giving unlawful user a definition that's not present in the statute, correct? Correct. Which is why we did lead with a lengthy argument in our response brief that we think the statute has an independent vagueness problem that is sort of baked into trying to analyze whether the statute is constitutional under the Second Amendment. If you don't know exactly what it means, that's its own problem. Historically, the only thing that was ever given meaning to was a habitual drunkard, correct? And that had maybe a common law background definition. But there's nothing in any of our history or tradition that has created a use definition, correct? That's right. And if you take the early statutes from the 1920s and 30s, none of them had an unlawful user prong. And even today, there's only eight states that have an unlawful user prong. Almost all of them are focused on addiction or focused on it through the lens of even more concretely things like have you been adjudicated to have a substance disorder or committed for treatment for a substance use disorder. Thank you, counsel. Justice Kagan? Ms. Murphy, I wanted to take you back to an answer that you gave to Justice Alito a while ago because I was a little bit surprised by it. And I want to make sure I understand your view on this. So the question that I understood him to ask you is that take a drug, you know, any drug you want, that is very dangerous while you're in its grip. You know, you're in some kind of psychosis or you've lost touch with reality or whatever it is. It's very dangerous, and if there's a gun around, that's like a real problem. But what I understand your test to be is that that's not enough because if you're not in its grip, if you're fine when you're not in its grip, then you don't meet the historical analog. And I want to make sure that that is your answer first. Yes. Yes. And if that's a somewhat problematic answer, if, you know, like how do you set – I guess what I'm looking for is like how do you win with marijuana but you don't win with that kind of drug? The kind of drug where really anybody looking at it would say, oh, that is a dangerous thing to have that drug and a gun in the same place. Is it just – you just can't do it? Well, I mean, the government doesn't seem to think it can do it because it's saying the statute requires habitual use. I don't know exactly where they draw the line in habitual use. But I'm talking – I'm actually talking about a habitual user. Okay. It's like, you know, there's a person and it's every other day they're using this drug, but on the day they're not using this drug, everything's cool. Yeah. And I think at a certain point when you take that concept of habitual drunker, it does take into account the nature of the substance and, you know, I mean, if you think about alcohol itself, that's why the test was focused not just on somebody regularly consuming it every day or every other day or whatever it was, but consuming it to the point of intoxication. And if you have a substance that by its nature, any consumption of it renders you the equivalent of like massively, massively intoxicated, then the habitual drunker test may be enough to capture the person who's using that every other day. Because we agree that the habitual drunker test didn't require somebody to be intoxicated all the time. But where the analogy falls apart, vis-a-vis marijuana, is the government saying it doesn't matter if it's somebody who's taken the sleep gummy, smoking one joint a couple nights a week when they come home after a long day at work, or if it's the person who's smoking all day before they drive their car and operate heavy machinery at work or whatever it may be. They say none of that matters, and we think it does. Thank you. Justice Gorsuch? Justice Kavanaugh? On the percentage of prosecutions, do you know how many, and I guess the government can also address this, how many are under the addiction prong versus under the use prong percentage-wise? I haven't seen anything that breaks it down just from looking at cases. There seem to be very few cases that are only the addicted-to prong, which isn't surprising because it's a harder case for the government to prove. But there are several cases where, unlike this one, the government proceeded under both the unlawful user and the addicted-to prong. And that's where this body of law has developed that says, well, we won't define unlawful user the same way the CSA defines addict, but as to the addicted-to prong, courts do sometimes look to that as the definition for addicted-to. On the individualized assessment issue, just so I understand, on addiction cases, you're saying there has to be an individualized assessment whether the person is, in fact, an addict. But if so proved, there's no separate individualized assessment of whether they're therefore dangerous, correct? That's right. That's why, I mean, it's a little confusing. There can be a categorical judgment once there's been a decision that you belong in the category. Exactly. Okay, so there's an individualized assessment, and then that's it. For use, though, I think you're saying there has to be an individualized assessment of whether they're a user. Weekly, I guess, is the government's test. And then on top of that, I think you're saying, but just correct me if I'm wrong, an individualized assessment of whether that use makes them dangerous, or how would you? Whether that degree of use of that substance renders somebody, impairs their ability to function most of the time. Is that the jury instruction? I think something, I mean, you know, I think courts can get a little bit of effort to figure out the best way to instruct it, but that's the concept that I see as the tradition unifying the historical laws about habitual drug use. Because this rubber hits the road with the actual jury instruction on this. Yes, and that's why if I were this court, I'd leave a little bit of room for courts to figure out the best way to do this. I mean, as courts have been working through the Second Amendment issues, they've been kind of figuring out different ways to come at it, and they've been doing so in cases where the government actually wasn't relying on the habitual drunkard tradition, so they were operating in, like, even a little bit more of a vacuum. But I think that's the concept to get at, is your use impairing you kind of most of the time, even if it's not that you're impaired in the sense of intoxicated every moment every day, but it's impairing your ability to function in your day-to-day life. And then last question, again, on the difference in the technical definitions between use and addiction, given the government's use of the word habitual with use, is there such a person, can there be a person who habitually uses who does not habitually use so as to endanger the public morals? Sure. I mean, I think if you think about marijuana use, like, somebody could be ‑‑ I guess it still depends what you mean by habitual user. Well, it may depend what you mean by public morals, but that's the statutory term, and I've seen jury instructions that looked at some that actually used the phrase public morals. I'm not sure what that means. Yeah, and, look, like, you know, I would probably resist in an addicted to case whether that particular language about public morals really maps on to the conception of dangerousness that matters here, but if you kind of focus in particular on are you endangering public safety, I think that gets you there, and that is part of the definition. Thank you. Justice Barrett. Justice Jackson. Thank you, counsel. Rebuttal, Ms. Harris. Thank you, Mr. Chief Justice. I'd like to contrast where this court might go with respect to people who present a special danger of misuse. Our position is Congress made a judgment in 922G3 itself that it is, in fact, dangerous to mix firearms with habitual use or addiction to controlled substances. That is backed by the historical habitual drunkard tradition where there weren't these sort of fine-grained lines that respondent appears to be drawing as to exactly how incapacitated you are. It's sort of a common law approach that starts with magistrates and justice of the peace making these determinations. Over time, there's more consensus, but I find it ironic that they're focused on modern-day civil commitment laws to try to superimpose on a body of sort of case-by-case determinations of justice of the peace, do you fit into the category of habitual drunkard or not, some sort of unifying theme. What they, on the other hand, want to do with respect to these hundreds of prosecutions a year under 922G3, not a mere five, and most of which are for the unlawful user prong, the buy and share for sure, is to revert to what I think ends up being individualized determinations all the way down. They seem to say you have to, as a constitutional matter, I think on the strength again of these modern laws, have individual determinations for every single addict under that prong. And otherwise, they seem to sometimes say category by category is fine for some drugs, but I really don't know how that would hold up. What they seem to be saying is actually even for categories like heroin, like PCP, whatever it is, you still would have to have a chance to say what is your frequency, what is your mix of drugs in the mix, what are other things that make you dangerous. I think all of it collapses, and that is a rejection of what the court accepted in Heller onward, which is there can be some categories on a category by category basis of a special danger of misuse. I think where does this leave the rest of the inquiry? It certainly creates a mess of 922G3. I think what we've heard about are many trials in every single case and an attempt to capture Justice Kagan's hypothetical of like the hallucinogenic nonaddictive drug. Is that sufficiently similar to the effect of alcohol on founding-era generation people who were sufficiently drunk sufficiently amount of the time in the same way as alcohol to be sufficiently dangerous for this purpose? I don't know how anyone would have figured it out, but certainly what's happening now is not district courts finding an easy time method, as Chief Judge Colleton's recent dissent in Lavena indicates. It's just remands all the way down with no really good way to proceed and making all these kind of pharmacological judgments that are very, very difficult for district courts and really do end up being individual determinations. Where does this leave the rest of 922G? I think that's a real problem also with respondents' approach. It's not just apparently for 922G3 where there has to be what will back into individualized healering in a position. I think this is all the way down from G1 felons, every single category of felons, even a serial murderer. You would have to be able to second-guess. Is that person really dangerous? Is that a good proxy? How many people? What other kinds of offenses? To G2, the fugitives, if you're just out for a couple days, are you really a dangerous fugitive? Who should be disarmed? To G4, with respect to mental illness, I think the questions just cascade from there and make an absolute hash of the 922G framework, which has been something the government has relied on to deal with more than, as Justice Alito's dissent in Raheith notes, something that is a cornerstone of violence prevention. Third, I don't think you can short-cut to who knows what a habitual user is. I think courts of appeals have provided a good yardstick for this. There is no confusion on this. The distinction between a habitual user and an addict is both very real and important. A habitual user, again, is judged by the frequency of their use. We're at the indictment stage here. The government will have to prove beyond a reasonable doubt to a jury that the frequency of use here, which again is concededly multiple times a week of an illegal substance, marijuana, is in fact habitual use under the way courts of appeals have interpreted this. I don't think that's confusing. I think the knowledge requirement presents a large amount of checks, and I think that does real work vis-a-vis the addict prong, which deals with people who can't control their urges even if they're not currently using the substance. The two work in tandem, and the fact that respondents seem to acknowledge that perhaps lots of these unlawful users can in fact be constitutionally prohibited from possessing firearms, at least only during the period of their habitual use, I think is a problem for respondents' positions. Because if all they have at that point is this mess of individualized determinations, then the category-by-category approach is out the window for every single drug, no matter how dangerous, no matter how different it is from alcohol, even if it is the most dangerous hallucinogenic drug, that even if you use it once a week causes hallucinations at unpredictable periods going forward. I think that is the approach that is risked here, and this better course is to say habitual drunkards are a valid tradition. You do not have to exactly match the degree of alcohol impairment to fit in that tradition. Thank you. Thank you, counsel. The case is submitted.